[No. B181180. Second Dist., Div. Eight. May 30, 2008.]

SHEILA STONE, Plaintiff and Respondent, v.
CENTER TRUST RETAIL PROPERTIES, INC., Defendant and Appellant.

610

---

COUNSEL

Horvitz & Levy, David M. Axelrad, Wendy S. Albers; Wilson, Elser, Moskowitz, Edelman & Dicker, Steven J. Joffe and J. Walter Gussner for Defendant and Appellant.

Ward & Ward, Alexandra S. Ward; Law Offices of Bruce D. Kordic and Bruce D. Kordic for Plaintiff and Respondent.

OPINION

**RUBIN, J.**—Commercial landlord Center Trust Retail Properties, Inc., appeals from the jury's six-figure damage award to Sheila Stone for the physical injuries she suffered in Center Trust's mall. We reverse and remand for partial retrial.

## FACTS AND PROCEDURAL HISTORY

Appellant Center Trust Retail Properties, Inc., owned a Los Angeles retail mall in which the Gumboz Creole Cajun restaurant was a tenant. In August 2001, the restaurant defaulted on its rent. Two months later, Center Trust served the restaurant with a five-day notice to pay rent or quit, but the restaurant did neither. In November, Center Trust filed an unlawful detainer complaint, and later that month took the restaurant's default. On December 3, 2001, the unlawful detainer court entered a partial judgment for possession by Center Trust, and 10 days later issued a writ of possession. "On or about" December 27, 2001, Center Trust was "restored [to] possession of the premises."

A week and a half later, respondent Sheila Stone hosted a party at the restaurant, which was still operating.[1] During the party, guests danced on a temporary wooden dance floor placed over the carpet. While dancing, Stone slipped on water on the floor and fell, fracturing her ankle. There was enough water to dampen her clothes from her back to her ankle as she lay on the floor, and several witnesses described the carpet next to the floor as "soaked."

Stone's ankle fracture required three operations to repair. While recovering from one of the surgeries, she wore a cast that made walking awkward and fell and broke her wrist, which required two operations to repair. All told, Stone endured five operations and suffers from permanently diminished range of motion and lingering pain.

Stone sued appellant Center Trust and the restaurant's owner for her injuries. Center Trust cross-complained against the owner for indemnity, but he was never served with either Stone's complaint or Center Trust's cross-complaint and was eventually dismissed from the proceedings.

---

[1] The restaurant did not permanently go out of business until sometime between the day after Stone's party and eight days later. Appellant's motion to take evidence or for judicial notice of related facts is denied as unnecessary to a resolution of the appeal.

By the parties' agreement, the court bifurcated the liability and damages phases of the trial. At the end of the liability phase, the jury found the restaurant 65 percent responsible for Stone's injuries, Center Trust 19 percent responsible, and Stone herself 16 percent responsible. The trial moved to the damages phase, at the end of which the jury found Stone had suffered $391,000 in economic damages and $300,000 in noneconomic damages. Reducing her economic damages by her comparative fault and limiting her noneconomic damages recovery from Center Trust to its percentage of responsibility, the court ordered Center Trust to pay Stone $328,440 in economic damages and $57,000 in noneconomic damages. (Civ. Code, § 1431.2.) This appeal followed.

## DISCUSSION

### 1. *Center Trust's Duties as a Landlord*

■ Center Trust owned the mall in which the restaurant was a tenant. All landowners, including landlords, must use reasonable care to protect people who come onto their property. (Civ. Code, § 1714; CACI Nos. 1000, 1001, 1006.) For landlords, reasonable care ordinarily involves making sure the property is safe at the beginning of the tenancy, and repairing any hazards the landlord learns about later. ■ As the court explained in *Mata v. Mata* (2003) 105 Cal.App.4th 1121, 1131–1132 [130 Cal.Rptr.2d 141], disapproved in part on another ground in *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 247–250 [30 Cal.Rptr.3d 145, 113 P.3d 1159]: "Because a landlord has relinquished possessory interest in the land, his or her duty of care to third parties injured on the land is attenuated as compared with the tenant who enjoys possession and control. Thus, before liability may be thrust on a landlord for a third party's injury due to a dangerous condition on the land, the plaintiff must show that the landlord had actual knowledge of the dangerous condition in question, plus the right and ability to cure the condition."

Limiting a landlord's obligations releases it from needing to engage in potentially intrusive oversight of the property, thus permitting the tenant to enjoy its tenancy unmolested. A landlord's move to evict a defaulting tenant unsettles their relationship, however, requiring a rebalancing of their rights and duties. Stone argued in the trial court that Center Trust's duty of care should have expanded to include inspecting the restaurant, during which it would have discovered a water leak. Center Trust contends nothing should have changed, however, leaving it with no duty to inspect the restaurant or

protect its tenant's customers. (*Uccello v. Laudenslayer* (1975) 44 Cal.App.3d 504, 510 [118 Cal.Rptr. 741] [landlord ordinarily not liable to a tenant's guests and invitees for dangerous conditions which arise on the property after the tenant occupies it]; see also *Chee v. Amanda Goldt Property Management* (2006) 143 Cal.App.4th 1360, 1373–1374 [50 Cal.Rptr.3d 40]; 8 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 22:48.) From the jury's verdict for Stone, we infer the jury found Center Trust breached a duty to her. We conclude Center Trust did have a duty, but the trial got off onto the wrong track because the court did not adequately define that duty's scope.

■ The court instructed the jury that a landlord must act reasonably to correct defects it knew, or should have known, about. (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 885 [2 Cal.Rptr.2d 79, 820 P.2d 181] [duty legal question for court].) The court did not, however, mention any duty to inspect. We conclude it should have instructed such a duty existed during the eviction proceedings. ■ Unlawful detainer actions substitute for a landlord's self-help to avoid, in part, the conflict and possible violence of a landlord trying on its own initiative to physically evict a defaulting tenant. Unlawful detainer suits do not, however, bar contact between a landlord and tenant. Moreover, as a general proposition litigation does not excuse a landlord's turning a blind eye to conditions on its property. Center Trust knew defaulting tenants sometimes neglected property. Furthermore, Center Trust knew the restaurant was violating its lease by running an after-hours dance club on the premises. Despite knowing of the restaurant's lease violations and being aware of possible neglect of the premise's physical condition, Center Trust did not inspect its property.

■ It is one thing for a landlord to leave a tenant alone who is complying with its lease. It is entirely different, however, for a landlord to ignore a defaulting tenant's possible neglect of property. Neglected property endangers the public, and a landlord's detachment frustrates the public policy of keeping property in good repair and safe. To strike the right balance between safety and disfavored self-help, we hold that Center Trust's duty to inspect attached upon entry of the judgment of possession in the unlawful detainer action and included reasonable periodic inspections thereafter. (*Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16] [important factors to consider in finding a duty of care are "foreseeability of harm" and "preventing future harm."].) Upon entry of judgment, a tenant's incentive to maintain a property dissipates because continued maintenance likely benefits only the landlord. To protect the public, the incentive to maintain the property must not be an orphan abandoned by a tenant and ignored by a shortly reoccupying landlord. Entry of judgment provides a workable bright line for the parties to know where responsibility lies, and aligns that responsibility with the parties' reordered incentives. (*Mora v. Baker Commodities, Inc.* (1989) 210 Cal.App.3d 771, 782

[258 Cal.Rptr. 669] ["The burden of reducing or avoiding the risk and the likelihood of injury will affect the determination of what constitutes a reasonable inspection"].)

Not only did Center Trust have the duty to inspect, it had the right. *Martinez v. Bank of America* (2000) 82 Cal.App.4th 883 [98 Cal.Rptr.2d 576], is instructive. There, the court found that during prosecution of unlawful detainer proceedings, a landlord did not have the right, and therefore had no duty, to inspect property over the tenant's objection. (*Martinez*, at pp. 894–895.) *Martinez* implies, however, that upon entry of a judgment of possession, the property owner has both the right and duty to inspect. It states, "until a judgment was obtained and satisfied in that unlawful detainer proceeding, the [property owner] did not have the ability to directly and promptly control conditions existing on the . . . property occupied by the [tenant]. [Citation.] For that reason, the [property owner] had no duty to [third parties on the property]." (*Martinez*, at p. 893; but see *Leakes v. Shamoun* (1986) 187 Cal.App.3d 772, 778 [232 Cal.Rptr. 171] [landlord has less control over tenant who is not doing something as basic as paying rent].) Here, the lease explicitly gave Center Trust the right to inspect if the restaurant defaulted. The eviction proceedings reaffirmed that power and right, and transformed Center Trust from a landlord disinterested about the restaurant's day-to-day conditions to a landlord on the verge of recovering its property and who could not ignore the possible hazards under its nose.

Center Trust cites decisions that a landlord ordinarily is not liable to a tenant's guests and invitees for dangerous conditions which arise on the property after the tenant occupies it. (*Uccello v. Laudenslayer, supra,* 44 Cal.App.3d at p. 510; see also *Chee v. Amanda Goldt Property Management, supra,* 143 Cal.App.4th at pp. 1373–1374; 8 Miller & Starr, Cal. Real Estate, *supra,* § 22:48.) Center Trust's status as a landlord with a judgment of possession made it a hybrid, however, with duties lying between the limited duties of a nonpossessory landlord and the greater duties of an occupying landowner. Its hybrid status makes inapposite the authorities it cites.

At the time of trial, the parties and the court lacked guidance from case law about the duty to inspect. Accordingly, the parties did not appropriately shape their trial presentations to help the jury pin down the timing of Center Trust's duty to inspect, the nature of any inspections, any impediments thereto and whether Center Trust would have discovered the leak during those inspections. We cannot tell from the record at what point, starting from the restaurant's default in rent in August until Stone's accident in January, the jury concluded Center Trust's duty attached. Consequently, the jury might have concluded Center Trust should have inspected the property shortly after the restaurant's August default, instead of, as we hold, the entry of the judgment of

possession in December. We therefore remand for retrial of the restaurant's and Center Trust's liability only. During retrial, the parties may present evidence whether reasonable inspection upon entry of the judgment and any later inspections would have discovered the leak. The court shall thereafter instruct the jury that Center Trust had a duty to inspect the restaurant upon entry of the judgment and at reasonable intervals thereafter. After the jury determines Center Trust's at responsibility, if any, for Stone's injuries, the trial court shall recalculate her damage award using the first jury's determination of Stone's total damages in the earlier trial.

## 2. *Economic Damages*

Center Trust contends the evidence did not support the amount of Stone's economic damages award. Her economic damages consisted of medical expenses and lost past and future wages. Center Trust does not challenge Stone's lost wages, but contends she offered no evidence that her medical expenses were reasonable. According to Center Trust, Stone's evidence covered only the amount of her bills, but not their medical legitimacy. Center Trust focuses its argument particularly on a $100,214.05 medical services lien filed by San Bernardino County. (Gov. Code, § 23004.1; Civ. Code, § 3045.1.) Urging us to disregard the lien as insufficient to establish reasonableness by itself, Center Trust asks that we substantially reduce Stone's recovery in the amount of about $100,000.

We decline Center Trust's invitation because we do not need to rely on the lien to uphold the jury's award. The verdict form stated Stone's economic and noneconomic damages, but did not identify her damages with any more detail than those two categories. The form included no special jury findings about different types of economic damages, such as lost wages and medical expenses. Thus, as long as the record supports the total amount of economic damages, regardless of whether that evidence related to medical expenses or lost wages, we must affirm that part of the award. (*Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1158 [46 Cal.Rptr.3d 780].)

Here, the lost wages evidence supported the jury's award. Up to the time of trial, Stone's injuries made her unemployable. Her expert economist calculated her lost past wages as $78,561. He also calculated the present value of lost future income of at least $267,971 if she had worked until she was 62 years old. He explained that he assumed retirement at 62 based on government statistics that showed a woman of Stone's age worked on average only 11 more years. We note, however, that the jury was free to reject the economist's assumption about the number of years Stone had intended to work, particularly given her testimony that she had hoped to work until she was 65. Arithmetic shows that three more working years from age 62 to 65

raises Stone's lost future wages by $73,083. ($267,971 ÷ 11 years equals $24,361 lost annually in future wages; $24,361 x three additional working years equals $73,083.) Adding $73,083 for three extra years of lost future wages to $267,971 (11 years' lost future wages) and $78,561 (lost past wages) equals $419,615, which is enough to support the economic damages award of $391,000. (We note our discussion does not even include the testimony about possible future medical expenses of $15,000 to $20,000, which could raise Stone's economic damages even more.)

## DISPOSITION

The judgment is reversed and the matter remanded for retrial of liability only. Each side to bear its own costs on appeal.

Cooper, P. J., concurred.

**EGERTON, J.,**[*] Dissenting.—I respectfully dissent.

Today the majority announces a new rule of law. Neither side advocates this new rule. Appellant and defendant Center Trust Retail Properties, Inc., a landlord, is not urging us to expand the duties and liabilities of landlords. Respondent and plaintiff Sheila Stone would like us simply to affirm the jury's verdict for her and the judgment in her favor. Instead, we reverse and remand. So we leave the adversarial process behind with this creation of new law.

Center Trust owned a mall. One of the tenants in the mall was a restaurant. The tenant and operator of the restaurant stopped paying rent, and Center Trust eventually initiated eviction proceedings. Center Trust obtained a writ of possession but the sheriff had not served the writ when Stone slipped on water and fell, injuring her ankle. While Center Trust had not regained physical possession of the restaurant on the date Stone fell, it had said in a legal document that it had been "restored to possession" of the premises about a week earlier. The trial court instructed the jury that a landlord must act reasonably to correct defects that it knew or should have known about. The jury obviously found that Center Trust knew or should have known of the water on the floor of the restaurant.

In my view, the trial court properly instructed the jury on the applicable law. CACI Nos. 400, 401, 405, 406, 411, 413, 430, 431, 1000, 1001, 1003, 1004, and 1006 set forth the governing law. The trial court gave all of these

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.

instructions, as modified, without objection from either party. CACI No. 1001, entitled "Basic Duty of Care," told the jury, in part, "A person who owns property must use reasonable care to discover any unsafe conditions and to repair, replace, or give adequate warning of anything that could reasonably be expected to harm others." CACI No. 1006, entitled "Landlord's Duty," told the jury, in part, that "[a]fter a tenant has taken possession, a landlord must use reasonable care to correct an unsafe condition under the landlord's control if the landlord knows or reasonably should have known about it." The court also gave (over Stone's objection) a special instruction that Center Trust asked for. That instruction told the jury, "The factor of possession *and* control is relevant to determining whether a landlord acted reasonably under the circumstances. 'It would not be reasonable to charge a lessor with liability if the lessor did not have the power, opportunity and ability to eliminate the danger.' "

The jury applied this governing law to the facts it found, based on all the evidence presented at trial, and returned a six-figure verdict for the plaintiff. The majority apparently concludes—although it does not say so—that the evidence at trial is insufficient to support the jury's verdict. If substantial evidence supported the verdict, the majority could simply affirm the judgment. Instead, the majority extends and expands the law to create a new legal duty. But Stone did not ask for any special instruction on a "duty to inspect" beyond what the CACI's say. Nor has she cross-appealed.

The majority says that, "[a]t the time of trial, the parties and the court lacked guidance from case law about the duty to inspect." (Maj. opn., *ante*, at p. 614.) This is another way of saying that no one knew about this standard that only today comes into being. The trial court cannot be faulted for failing to instruct the jury on law that did not exist when the trial court tried the case.

The majority says that this court's decision in *Martinez v. Bank of America* (2000) 82 Cal.App.4th 883 [98 Cal.Rptr.2d 576] (*Martinez*) "implies" this new rule of a duty to inspect. (Maj. opn., *ante*, at p. 614.) Respectfully, it does no such thing. In that case, a bank foreclosed on a property and began eviction proceedings against the tenant. While the unlawful detainer case was underway, "a pack of large, dangerous dogs" that the tenant kept on the property attacked and injured the plaintiff. (*Martinez, supra*, 82 Cal.App.4th at pp. 886–888.) The injured person sued the bank. The trial court granted summary judgment for the bank, and the Court of Appeal affirmed.

The court said the issue was "whether a bank, which acquires real property through foreclosure but which does not have possession or control of the property, has a duty to inspect the property and remedy its defects." (*Martinez,*

*supra*, 82 Cal.App.4th at p. 886.) The appellate court concluded that "the bank ha[d] a duty to inspect and remedy defects on the property only if it ha[d] actual knowledge of the defects and the ability to prevent foreseeable harm." (*Ibid.*) The court concluded "that the pending unlawful detainer proceeding, and the former owners' refusal to relinquish possession and control of the property, meant that the bank did not have the authority, ability, or power to repair defects on the property." (*Id.* at p. 887.) "Because of this lack of knowledge and of power," the court said, "and based on the factors in *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561], we find that the bank owed no duty to plaintiffs." (*Martinez, supra,* 82 Cal.App.4th at p. 887.)

The majority here observes that Center Trust had a right to inspect the premises. (Maj. opn., *ante,* at p. 614.) Indeed, the lease authorized the landlord "to enter the Premises at all times during usual business hours for the purpose of inspecting the same." The lease also gave the landlord the right, upon the tenant's default, "to reenter the Premises and occupy the whole or any part thereof . . . ." The majority, however, then finds a *duty* to inspect based on this *right* to inspect. This reasoning turns *Martinez* on its head. The jury properly concluded that Center Trust knew or should have known of the condition of the property. The trial court said the same thing in denying Center Trust's motion for a directed verdict. The jury and the trial court apparently reached this conclusion based on all the evidence, including the fact that the tenant was blatantly engaging in a use of the premises that the lease forbade—the operation of a dance club—when the lease specified a sitdown restaurant. Substantial evidence supports the jury's verdict.

Moreover, if the relations between landlords and tenants are to be re-aligned, the California Legislature is the right entity to consider this change. Relying on the Legislature would offer advantages. First, the Legislature is in a better position to determine whether this change is beneficial social policy. The majority opinion seeks to increase public safety by increasing liability. Is this change worth the cost? I do not know. There will be costs, no doubt. That is the point of imposing duties on landlords: to force them to spend more time and resources inspecting tenant premises in malls. These costs might be considerable. After all, there are many malls in California. I have no way to determine whether the savings in accident costs would offset these higher costs to mall landlords and, ultimately, to consumers. If so, then the legal change would be attractive, and might appeal strongly to our legislators. If not, then this change would cause a net increase in the costs of living in California.

Second, the Legislature changes rules prospectively. It gives interested groups notice and an opportunity to be heard. A retroactive change does neither. Here, the majority proposes to punish the landlord for failing to comply with a duty that, the majority says, did not exist until now.

I would affirm the judgment of the trial court.

A petition for a rehearing was denied June 30, 2008, and appellant's petition for review by the Supreme Court was denied August 27, 2008, S164971. Moreno, J., and Corrigan, J., were of the opinion that the petition should be granted.